IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 98-50166

---

In The Matter Of: MEDWAY RANCH, INC,
also known as Medway Ranch

                                        Debtor

BEAL BANK, S.S.B.

                                        Appellant

                    versus

MEDWAY RANCH, INC

                                        Appellee

---

Appeal from the United States District Court
for the Western District of Texas

---

March 12, 1999

Before HIGGINBOTHAM, BENAVIDES, and DENNIS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

    This bankruptcy appeal involves two notes that allowed for payment on one to count also towards the other in the absence of default on the first. We are persuaded that there was a default on the first note that was not validly waived. We conclude then that the second note has not been paid. We REVERSE the contrary decision by the district court and REMAND for further proceedings.

The two contested notes were issued in the first Chapter 11 bankruptcy of Medway Ranch and at issue in its second bankruptcy. In the first bankruptcy, the Ranch executed and delivered the notes to the FDIC as liquidator of Commercial State Bank in Houston. The First Note, secured by a first lien on certain real property, evinced a debt in the principal amount of $1,300,000, owed by the Ranch to the FDIC. The Second Note, in a face amount of $445,112.44, evidences unpaid, accrued interest and costs arising from the Ranch's obligation to the FDIC.

Today our focus will be upon Paragraph 3 of the Second Note, which treats the crediting to the Second Note of payments made on the First Note. It provides:

> Notwithstanding the foregoing, so long as payments are timely made on that certain First Lien Real Estate Note of even date herewith in the principal amount of $1,300,000.00 payable by Debtors to the order of FDIC (the "First Lien Note", . . .) and secured by a First Lien Deed of Trust of even date covering the property described . . . (the "Collateral") no payments will be required to be made on this Note apart from payments made on the First Lien Note and every payment made on the First Lien Note from any source (except for any credit(s) against the First Lien Note by the FDIC or other holder thereof who purchases all or any part of the Collateral pursuant to foreclosure under said First Lien Deed of Trust) shall be deemed a payment of this Note as well, such that this Note will be paid in full through total payments from any source, except as limited above, of $1,150,000.00 on the First Lien Note.

This appeal involves, among other legal issues, the interpretation of "timely," whether the "so long as . . ." phrase modifies the "no payments will be required . . ." phrase, whether payments on the First Note count dollar-for-dollar on the Second Note, and the meaning of "pursuant to foreclosure." It must also be kept in mind that although the Second Note is only for $445,112.44, a total of $1,150,000.00 must be paid on the First Note before the obligation on the Second is extinguished.

Several provisions of the First Note are relevant as well. Paragraph 2 of the First Note provided that it was "payable in 7 semiannual payments of $5,000.00 principal plus accrued interest each commencing on the first day of the month next following 18 months after date hereof and continuing regularly every succeeding six-months thereafter," with the remainder due at maturity. Under Paragraph 3, upon the sale of any portion of the collateral property, the debtor would make a principal payment according to a specified formula, and in turn would receive a partial release from the liens. Paragraph 6 of the agreement provides that "time is of the essence." The next sentence provides that "[i]n the event of default in the payment of any installment of principal or interest when due, or in the performance of any obligation in any instrument securing payment," the holder could, with specified notice and an opportunity to cure, accelerate the note.

While the FDIC remained the holder of the two notes, the Ranch sold property, and the proceeds were applied according to the terms

3

of the First Note. The Ranch did not make the third semiannual payment described in Paragraph 2 by the specified date of December 1, 1995, but the FDIC accepted a late payment. The FDIC did not then declare default or exercise any post-default remedies, including acceleration of the debt.

On May 31, 1996, Loan Acceptance Corporation, a subsidiary of Beal, purchased from the FDIC all of the FDIC's right, title, and interest under the First and Second Notes, as well as the accompanying deeds of trust. The Ranch's sales slowed, and it was unable to make the June 1 payment. Loan Acceptance Corporation transferred the Notes and deeds to Beal on June 6, and on July 26, Beal notified the Ranch of default and of its intent to accelerate the First and Second Notes. On November 12, Beal sent the debtor a foreclosure notice stating that unless the amount owed was paid, Beal would foreclose on the property on December 3. On December 2, however, the Ranch filed its second Chapter 11 petition, and the foreclosure was automatically stayed.

On December 23, the bankruptcy court heard the debtor's motion to sell certain property pursuant to an executed earnest money contract. As the first lienholder, Beal objected. The bankruptcy court conditionally approved the sale on December 30, but allowed Beal the opportunity to purchase the property by credit bidding its lien pursuant to 11 U.S.C. § 363(k). Beal bid $1,200,000, and on February 24, 1997, the bankruptcy court authorized the sale, with the bid amount to be credited against sums due on the First and

4

Second Notes. The court's sale order expressly reserved the issue of how much was due under the Notes.

A dispute ensued as to how much was due. Beal maintained that $54,694.08 was due on the First Note, and that $527,867.71 was due on the Second Note, representing the entire principal of $445,112.44 plus interest of $82,755.27. The Ranch's position was that because the credit bid on the property covered by the First Note exceeded $1,150,000, this sufficed to extinguish the obligations under the Second Note, without even considering the prepetition payments the Ranch had made.

The Ranch filed a Motion to Determine, and Beal filed a Proof of Claim in the secured amount of $1,762,728.28. The bankruptcy court adopted the Ranch's position, concluding that the FDIC had not made a demand for payment under the Second Note, and by not demanding payment by the due dates on the First Note, the FDIC had waived any rights on the Second Note predicated on the failure to make untimely payments on the First Note. With respect to the June 1 payment, the bankruptcy court found that the debtor had defaulted, thus entitling Beal to interest on that payment. The bankruptcy court, however, did not find that any payment was untimely. It ultimately concluded that only $113,218.00, plus 18% annual interest accruing after July 8, 1997, was payable. The district court affirmed, and this appeal followed.

II

5

The Ranch contends that payments from property sales sufficed as an alternative to the semiannual payments. Indeed, Paragraph 3(c) specifies, "Any excess shall be held in an interest bearing account and applied when due to the next payment or payments due under the Note." The "excess" is the net proceeds from the property sales less the aggregate minimum partial release prices depending on the type and quantity of acreage sold. The record does not indicate the type and quantity of acreage sold in particular transactions, so we cannot determine based on arithmetic alone whether any excess remained after a $59,827.16 payment of principal on January 25, 1995. The Ranch does not assert there was excess over the $59,827.16 sufficient to cover the June 1 and December 1, 1995, payments. Rather, the Ranch accepts that there was a $5,000 payment due on December 1, 1995, and that it was not paid on that date. Moreover, the Ranch eventually made that December 1 payment, plus interest, without objecting that the funds had already been paid through excess from property sales. The bankruptcy judge's findings were not to the contrary.

The Ranch stresses that "timely" is ambiguous and the bankruptcy court properly considered extrinsic evidence. See Tarrant Distrib. Inc. v. Heublein, 127 F.3d 375, 377 (5th Cir. 1997). This evidence showed that the required semiannual payments, though not made by the specified dates, were timely, because the Ranch had been making some payments through property sales. Determination of the parties' intent through extrinsic evidence is

a question of fact and thus subject to the clearly erroneous standard. See In re Fender, 12 F.3d 480, 485 (5th Cir. 1994). Thus, the Ranch presses, we should uphold the conclusion that timely does not mean on time.

The contract was not ambiguous. "Timely" means "by the date specified." The Ranch seeks to distinguish "timely" from "default," maintaining that even if one is in "default," payments may still be considered "timely." The agreement, however, makes timeliness and default sound like much the same thing. Paragraph 6 of the First Note strengthens this conclusion. Not only does it speak of "default in the payment of any installment of principal or interest when due," but it also declares that "time is of the essence." By this plain language a payment that is not timely is an event of default.

The Ranch builds its interpretive case on the testimony of Gary Miller, who indicated that Paragraph 3 of the Second Note originally provided for double-counting "so long as no default exists under" the First Note. Assuming this to be true, the change could have been merely an effort to clarify the word "default." The significance of the change, the Ranch argues, is that even if there were untimely payments on the First Note, subsequent payments on the Note still apply to the $1,150,000 due on the Second Note. This argument ignores the words "so long as," which remain part of Paragraph 3 and in ordinary parlance mean roughly "until it is not the case that." As soon as a payment is untimely, the provision,

both as it currently reads and as it read before, does not permit subsequent payments on the First Note to count towards the Second.

The Ranch also argues that "the timely provision does not apply to 'payments from any source' that count toward the $1,150,000.00 total payment amount that triggers forgiveness of the Second Note." Under this interpretation, the timely payments relieve the debtor of the duty to make payments on the Second Note apart from payments on the First Note, but payments on the First Note "from any source" count toward the Second Note regardless of when made. This interpretation is unsupportable. The "every payment made on the First Lien Note from any source . . ." phrase is preceded by an "and," which is not in turn preceded by a comma. A plain grammatical reading of the sentence thus shows that "so long as . . ." applies to "every payment . . .". Given the length of the provision, there is no reason that the drafters would not have split the provision into two sentences, if that accorded with the meaning intended.

Moreover, the interpretation fails to make sense of the provision. Under the interpretation, an untimely payment would not count toward the $445,112.44, but would still count toward the $1,150,000. The bankruptcy court apparently adopted this view. The court concluded that $1,150,000 is an "incentive number," such that none of the payments on the $445,112.44 would count until $1,150,000 in total payments were reached.

8

This interpretation cannot be squared with the text of the Note. Paragraph 3 indicates that the payments are to be credited "such that this Note will be paid in full through total payments . . . of $1,150,000." The bankruptcy court's interpretation would turn "such that" into "but . . . only"; "such that" suggests a qualification on how the payments will be credited, not that the payments will not be credited at all until a minimum threshold is reached. The only interpretation that takes into account the words "such that" treats each dollar of the $1,150,000 as applying proportionately, i.e. about 39 cents, towards the $445,112.44.

The bankruptcy court rejected this possibility, but its reasoning puts too much weight on the evolution of the language of the provision. The bankruptcy court recognized that in an earlier draft of the Second Note, the semiannual payment required was only $1,935.27, not the $5,000 required both on the First Note and on the final draft of the Second Note. Lo and behold, $1,935.27 is to $5,000 as $445,112.44 is to $1,150,000. Thus, the bankruptcy court correctly reasoned, in the original version of the Second Note, each dollar spent on the First Note was to count proportionately. Therefore, the bankruptcy court further inferred, payments on the First Note would count dollar for dollar towards the $1,150,000.

This final inference does not necessarily follow, since the change from $1,935.27 to $5,000 may have been made simply because it did not matter much which number was used. As long as payments were made on the First Note, no payments were required on the

9

Second, so there was no need for the numbers to be in proportion. Thus the history is not inherently inconsistent with the final language, and that language leads unambiguously to the conclusion that payments were to be applied proportionately. We thus hold that the semiannual payments on the First Note were not "timely" under Paragraph 3 of the Second Note, and that any payments on the First Note after the first untimely payment did not count toward paying off the Second Note. This includes Beal's credit bid; even if the bid was not "pursuant to foreclosure," the credit bid occurred after default and thus did not apply to the Second Note.

III

Even if the payments were untimely, the Ranch argues, the FDIC waived timeliness by not objecting or by accepting the late payment. To imply a waiver of a right, however, a court still must identify conduct that is clear, unequivocal, and decisive. See Estate of Blardone v. McConnico, 604 S.W.2d 278, 282-83 (Tex. Civ. App.--Corpus Christi 1980, writ ref'd n.r.e.). It is true that the Texas courts occasionally have found a waiver of a right to accelerate a note for late payment from a repeated, consistent acceptance of late payments. See Highpoint of Montgomery Corp. v. Vail, 638 S.W.2d 624 (Tex. Civ. App.--Houston 1982, writ ref'd n.r.e.) (finding a waiver where 120 of 132 accepted payments were late); see also In re Marriage of Rutherford, 573 S.W.2d 299 (Tex. Civ. App.--Amarillo 1978, no writ) ("The holder of a note may waive the right to foreclose as to past defaults where late payments have

10

been regularly accepted and notice has not been given that future defaults will provide the basis for foreclosure proceedings.").

Indeed, the Highpoint court found a waiver even where, as here, the contract included a provision indicating that acceptance of a late payment does not prejudice the creditor's right to declare default and accelerate at any other time. See Highpoint, 638 S.W.2d at 627. That provision too may be waived by repeated acceptance of late payments. See id.

But such a waiver has no role here. If the issue in this appeal were whether, on account of the FDIC's conduct, the Bank lost the right to accelerate the First Note, the contention would have purchase. This appeal concerns Paragraph 3 of the Second Note. That provision, as we explained, provides that double-counting shall stop as soon as a payment on the First Note is not "timely." This was a bargain for condition to non-liability on the second note. The condition failed on a late payment. Accepting late payments thereafter did not change the fact that the condition had not been performed.

IV

The parties have not briefed other issues relevant to determining exactly how much is owed on the notes, such as the date at which the higher default interest rate specified in the notes became effective. Rather than scour the record and make our best guess, we leave these issues to the bankruptcy and district courts. We REVERSE and REMAND for further proceedings to determine the

11

exact amount owed under the Notes.  Beal's motion to recover legal fees incurred in drafting its motion to strike is DENIED, and the remaining motions are DENIED AS MOOT.

REVERSED AND REMANDED